[No. 28736. Department Two. February 17, 1943.]

ROBERT Y. NELSON, *Appellant,* v. THE CITY OF SEATTLE, *Respondent,* MATT ZOFFEL, *Defendant.*[1]

*Bertil A. Granberg* and *Knapp & Vinton,* for appellant.

*A. C. Van Soelen, Arthur Schramm,* and *John A. Logan,* for respondent.

ROBINSON, J.—On the rainy morning of January 29, 1939, at about 12:30 a. m., the appellant, Robert Y. Nelson, was riding south on 12th avenue in Seattle in an automobile driven by James W. Kippen, when a car coming from the opposite direction and driven by Matt Zoffel crossed from the east side of the street and struck Kippen's car head-on. The collision occurred north of Jefferson street. Nelson was severely

[1]Reported in 134 P. (2d) 89.

and permanently injured. He brought this action against Zoffel and the city of Seattle as codefendants, his allegations against Zoffel being that he failed to keep a proper lookout, operated his automobile at an excessive rate of speed, on the wrong side of the street, and while not in full possession of his faculties.

As to the city, the plaintiff alleged that it had failed to keep the surface of the street safe for travel, in that it was surfaced with wooden blocks which had become saturated with oil and grease and extremely slippery when wet, and in failing to sand the surface of the wooden block pavement.

In its answer, the city admitted the allegations of the complaint as to Zoffel's negligence, but denied the allegations as to its own. Zoffel's pleadings are not in the transcript, he not being a party to the appeal, but it appears from the instructions to the jury that he disclaimed negligence on his own part and cross-complained against the city, alleging that it was negligent in allowing the street to be so maintained as to become slippery and dangerous when wet, and in not properly posting warning signs or closing the street to traffic.

Upon a trial of the action, the jury returned a verdict for the plaintiff against Zoffel for four thousand dollars, and against the city for two thousand thirty-six dollars. The trial judge rightly refused to accept this verdict, and, after further consideration, the jury returned a verdict for plaintiff against both Zoffel and the city for $6,036.55, and against Zoffel on his cross-complaint. Subsequently, the court granted the city's motion for judgment notwithstanding the verdict and dismissed it from the action.

The scope of the appeal is limited, and all questions which require decision in this court can be disposed of by inquiring whether or not there was sufficient

evidence to carry the plaintiff-appellant's case to the jury.

It appears from the evidence that 12th avenue is fifty-two feet in width from curb to curb. Going north, it was surfaced with red brick up to the south line of the Jefferson street intersection. From that point to a point seventy-five feet north of the north line of Jefferson street, it was surfaced with black top, or, as an engineer witness said: "That is what we call a black top non-skid." At the north end of this strip, the wood block paving began. Although Zoffel testified that he did not see it, there is positive testimony by three witnesses that there was a large warning sign near the east curb of the street twenty-six feet north of the north curb line of Jefferson street, reading: "Danger when wet; speed 15 miles." It was a very large sign, five feet tall and a yard in width, placed at a slight angle so that it would squarely face an oncoming driver as he was crossing the Jefferson street intersection. Knowing the dimensions of the sign, the size of the lettering is readily estimated from the large photograph in evidence. At the top, the word "DANGER" extended across the sign in red letters, at least eight inches in height. The next line "when wet" was in slightly smaller black letters. The third line is in figures "15," eight or nine inches in height, and the last, in black letters, "miles."

Zoffel, a logging camp foreman, left Ohop the preceding evening. He stopped at Orting at seven o'clock; got a glass of beer, and a haircut. Arriving at Seattle, he met Devin, a friend, about ten-thirty, and shortly thereafter they went to the DeHeer home in the Rainier valley, arriving some time after eleven. About an hour later, with Zoffel driving and Mr. and Mrs. DeHeer, their daughter, Miss Lassen, and Devin as passengers, he set out for the Norwegian hall. All of

the passengers, save the daughter of the DeHeers who was not present at the trial, testified that Zoffel drank no alcoholic liquor at the DeHeer home. Devin testified that Zoffel drank none after he met him at ten-thirty, and that he was sober then.

As the trial judge said, in his comprehensive and carefully considered memorandum announcing his ruling on the post trial motions, there was a theory that the Zoffel car began to skid at the junction of the black top or nonskid pavement and the wooden block, that is, seventy-five feet north of the north curb line of Jefferson street. But Zoffel testified that the skid began a little distance after he had crossed the street car rails on Jefferson street. Mrs. DeHeer corroborated that. DeHeer was very emphatic to the same effect. Zoffel marked the point of beginning of the skid on the scale map opposite the Jefferson north cross walk and refused to be driven from it.

"Q. Now, if it should appear from the testimony later to be adduced here that the blocks did not commence until farther north on 12th Avenue—that would be the point where your skidding commenced, would it not? [Objection by counsel.] THE COURT: He may answer the question. A. Right where I put the mark 'Z' on the map."

Zoffel testified that he skidded seventy-five or eighty feet. If he did, and he and his two passengers were correct as to the starting place of the skid, it began on the black top and continued upon it for the first sixty feet.

Other witnesses testified that Zoffel did not begin to skid until he had traveled some distance on the wood block pavement. Boyd, who was driving behind him, marks the beginning of the skid about ninety feet north of where Zoffel locates it, and even north of the point where Zoffel testified that it ended. The point

where the collision occurred is located by Boyd, by Kippen, and by the two police officers on duty on the accident investigation detail, who arrived shortly after the collision, as opposite Barclay Court, the center of which is about 210 feet north of where Zoffel and the DeHeers testified the skid began, and more than 100 feet north of where Zoffel said it ended.

Zoffel testified that he shifted into low as he approached the intersection, put the car into high as he got across, was then traveling at about fifteen miles per hour, and at once began to skid. There is evidence by Boyd, who was driving a short distance behind him and whose testimony shows that he was a witness of the careful, conservative type, that Zoffel crossed Jefferson street at more than thirty miles per hour. Kippen, the driver of the car with which he collided, testified that Zoffel bore down on him at "a terrific rate of speed."

Kippen testified that he accused Zoffel of being drunk, and Zoffel admits that he did, but does not remember whether he denied it or not. Boyd testified that, in assisting in removing Zoffel from his car, he detected a strong odor of liquor. Some attempt was made to ascribe this to the alcoholic content of the hair dressing which was used after Zoffel's haircut at Orting some five or six hours before. . Boyd maintained, however, that Zoffel, who had a chest injury, was breathing hard, and that the odor came from his breath. Hammond and Wright, the police officers of the accident investigation detail, testified that they dealt with drunken drivers nearly every night, and sometimes five or six in one night, that every one in the Zoffel party had been drinking, and that Zoffel, to whom they paid particular attention, had definitely been drinking whiskey, and was in no condition to drive. Kippen, who rode downtown with the officers,

Zoffel, the DeHeers, and Devin in the police car, testifies that Miss Lassen said to Zoffel en route: "I told you that you should not have driven," and that Mrs. DeHeer said: "Don't say that. Be quiet." Officer Hammond said that one of the women told Zoffel that he should not have driven the car, and that the other one said: "Shut up." Officer Wright, who was driving the police car, said that he heard one of the women say that Zoffel was in no condition to be driving a car, and the other told her to shut up, she was talking too much. The rebuttal of this testimony is very weak. Mrs. DeHeer testified that she did not remember any such conversation, but that she did say to Zoffel: "I told you that we should have taken Dutch's car," meaning her husband's car.

■ Respondent city points out that the verdict of the jury convicts Zoffel of negligence, and that it is clear from the abortive verdicts returned that it considered that his negligence was the chief cause of the appellant's injury. It is further urged that it is reasonably inferable that the jury regarded him as so intoxicated that he was unable to negotiate the non-skid black top just north of Jefferson street without skidding, and on these considerations it is contended that this is a case for the application of the doctrine of intervening negligence. But if the jury concluded that Zoffel was in no condition to drive a car, it probably also thought him in no condition to remember just what happened, and accepted the evidence of other witnesses that he did not begin to skid until after he got on the wood block pavement. The most that can be said with certainty is that there is no evidence that the skidding began at the junction of the black top and wood block pavements. We reject the intervening negligence theory, upon the authority of the re-

cent case of *Berglund v. Spokane County*, 4 Wn. (2d) 309, 103 P. (2d) 355.

This case gets down to the question as to whether the evidence presented any issue of fact for the jury to determine. In considering the post trial motions, the trial judge thought it did not. We quote briefly from his memorandum decision:

"There has been no evidence offered in the present case that the street here in question was not in the beginning of its history constructed in conformity with good engineering practice, or that the material of which complaint is now made, wood blocks, was not material then accepted by road makers in general. There is no convincing suggestion that these blocks were not properly laid and through the years properly maintained. There is no suggestion in the record of the presence on the occasion of this accident of an identified hole, rut or similar defect in the highway. In fact, there is in this record no clear identification of any particular spot or area of the pavement surface as being the place to which blame is now sought to be attached."

At another place in his memorandum, the trial judge observed that there was no evidence of any obstruction on the highway or of any undue accumulation of oil or other material.

At the most, there was evidence that the street was "slippery" and "quite slick," when wet. Appellant's counsel place much emphasis upon the fact that counsel for the city stipulated in court that the street was dangerous, when wet. When taken in consideration with the circumstances under which the stipulation was made, this is no more than the city admitted in posting the signs on both sides of the street, reading: "Danger when wet; speed 15 miles." Zoffel's cross-complaint raised an issue as to the sufficiency of the warning given, but appellant's complaint did not, and

had it done so there is no evidence in the record that would have warranted the jury in finding it insufficient. The signs were larger and more conspicuous than the ordinary warning signs used throughout the state by the highway department, and by cautionary road signs throughout the country, generally.

The only question to be determined at the end of the trial was: Is a city negligent in maintaining a street over which, when wet, it is unsafe to travel at more than fifteen miles per hour, provided appropriate warning is given of that fact? That presents no question of fact for determination. It is a question of law. The trial court so treated it, and held that, under such circumstances, a city would not be negligent. It is said in 25 Am. Jur. 782, § 498:

"A slippery condition of a street or other public way may, under some circumstances, constitute an actionable defect therein, although a mere slippery condition due to natural causes is not ordinarily so regarded."

We believe, from an examination of the authorities, that this is an accurate statement of the law, at least where adequate warning is given. The cases cited by appellant are not relevant. In *Gabrielsen v. Seattle*, 150 Wash. 157, 163, 272 Pac. 723, 63 A. L. R. 200, this court indeed affirmed a judgment rendered by the trial court, but on facts entirely different from any appearing in the instant case. We quote:

"The court permitted a recovery against the city on the theory that the city was negligent in its care of that part of the particular street which it permitted to remain open for public travel, in that it suffered to accumulate and remain thereon oil and grease in such quantities as to render it dangerous for public travel."

In *Walters v. Seattle*, 97 Wash. 657, 167 Pac. 124, there was more than mere slipperiness involved. The

slipperiness was on a twelve per cent grade at the bottom of which was a deep hole. (The grade in the instant case was but one per cent ascending to the north.)

In *Simmons v. Cowlitz County*, 12 Wn. (2d) 84, 87, 120 P. (2d) 479, where the county maintained soft shoulders on a fourteen foot road, the absence of any warning was the determining factor.

"Respondent county did not warn the traveling public by signs or barriers of the dangerous condition it permitted to develop and of which it had knowledge."

In *Dillabough v. Okanogan County*, 105 Wash. 609, 616, 178 Pac. 802, the county had constructed and maintained an insufficient culvert at a curve in the road. It washed out, and plaintiff, being unable to see that it had done so, because it was on a curve, drove into the gap made by the waters. The court, after stating that the county had knowledge for two years that it was likely to wash out and was warned of its dangerous condition but a few days before it did, said:

"Yet they took no steps either to correct the defect or to warn the users of the road to be on their guard for a possibly dangerous condition. *The county owed to the traveling public one or the other of these duties.*" (Italics ours.)

The appellant cites other cases which are distinguishable on similar grounds, but has cited no case, nor have we found one, either in our own or in any other law reports, which holds that mere slipperiness is an actionable defect in the street when warning of it is given. From some opinions, as, for example, *Le Boeuf v. State*, 169 Misc. 372, 377, 7 N. Y. S. (2d) 621, 627, detached paragraphs may be quoted which seem to hold to the contrary, but, there, the element of warning was altogether absent. We quote:

"In view of the existing conditions at or near the crest of the hill on the highway in question, the failure of the state to give adequate warning by the erection of proper and adequate signs at a reasonable distance from the point of danger, constitutes a serious breach of duty, and created an unnecessarily dangerous condition."

The judgment of the trial court is affirmed.

SIMPSON, C. J., BEALS, BLAKE, and GRADY, JJ., concur.